
CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

JUL 1 7 2009

BY: JOHN F. CORCORAN, CLERK
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DONELL J. BLOUNT, SR., )
)
Plaintiff, )
) Case No. 7:08CV00504
)
v. )
) **MEMORANDUM OPINION**
)
TRACY RAY, ET AL., )
) By: Hon. James C. Turk
Defendant. ) Senior United States District Judge
)

Plaintiff Donnell J. Bount, Sr., a Virginia inmate proceeding pro se, brings this action as a

civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28

U.S.C. § 1343. In his complaint, Blount alleges that the defendant prison officials wrongfully

removed him from his religious diet, in violation of his rights under the First Amendment and the

Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He seeks injunctive relief

and monetary damages.[1] Defendant filed a motion to dismiss/motion for summary judgment, and

Blount responded, making the matter ripe for decision.[2] Upon review of the record, the court

finds that the motion for summary judgment must be granted.

---

[1] The United States Court of Appeals for the Fourth Circuit has recently held that RLUIPA does not authorize claims for money damages against an official who is sued in her individual capacity in reliance on the Spending Clause facet of the statute. Rendelman v. Rouse, 569 F.3d 182,__, 2009 WL 1801530, *6 (4th Cir. June 25, 2009). Because the Rendelman case did not advance any claim under the Commerce Clause facet of RLUIPA, however, the Fourth Circuit left open the question of whether claims for monetary damages might be authorized in that context against an official in her individual capacity. Id. Although it does not appear that Blount has raised his RLUIPA claims under its Commerce Clause nexus, his claim for injunctive relief under RLUIPA is not foreclosed by the Rendelman decision. Moreover, he simultaneously raises his religious rights claims under the Free Exercise Clause as well as RLUIPA. Accordingly, the court will analyze his RLUIPA claims along with his Free Exercise claims, with the understanding that his RLUIPA claims for monetary damages against the defendants in their individual capacities are already without merit to the extent that he raises them in reliance on the VDOC's receipt of federal funding.

[2] After defendants moved for summary judgment, Blount moved for voluntary dismissal of his claims against Defendant Stallard. In light of the effort to which defendants have gone to assert a dispositive defense on behalf of Stallard, the court does not find it appropriate to grant Blount's motion for voluntary dismissal. See Fed. R. Civ. P. 41(a)(2) (requiring leave of court for plaintiff's voluntary dismissal of claims after service).

## Background

Donell J. Blount, Sr., an inmate incarcerated at Red Onion State Prison in Pound, Virginia, professes to be a follower of the House of Yaweh, a religious faith that requires him to eat a kosher diet. One of the menu options the Virginia Department of Corrections (VDOC) makes available to inmates is the Common Fare Diet ("CFD"), a diet designed to meet the needs of inmates whose religious dietary beliefs cannot be met by the Master Menu. Procedures for administration of this special religious menu and others are set forth in Chapter 4 of the Food Service Manual, Operating Procedure ("OP") 501, effective November 1, 2007. Normally, the Institutional Classification Authority ("ICA") and the VDOC Central Classification Services ("CCS") must approve each offender for participation in the CFD. Approval for this special, more expensive diet depends on a number of factors, including the inmate's religious affiliation, his participation in religious services and programs as indication of the sincerity of his religious commitment, and his behavior. Once an offender is approved by CCS to receive the diet, he is required to sign a Common Fare agreement, a copy of which is sent to the Food Operations Director/Manager at the offender's assigned institution. Among other things, this agreement notifies the inmate that if he is observed eating or trading unauthorized food items, he will be removed from the CFD. By signing the agreement, the inmate agrees to eat CFD meals consistently and to follow the rules for receiving the diet.

When an officer has reported that a CFD-approved inmate was seen violating some condition of the CFD agreement, the inmate will be removed from the CFD list. For the first offense, the sanction is removal for sixty days; for the second offense, the removal is for ninety days. If the inmate commits a third violation of CFD requirements, he will receive an ICA hearing regarding whether his CFD approval should be revoked permanently, with an appeal of an adverse outcome to the CCS.

The CCS maintains a list of religions whose beliefs require adherents to eat a diet consistent with the CFD. House of Yaweh was added to that list in September 2004.

- 2 -

## A. Previous Litigation

Blount first requested the CFD in April 2004. The ICA approved his application, but the CCS disapproved it, because House of Yaweh was not on the list of approved CFD religions at that time. Blount filed a lawsuit, arguing that deprivation of the CFD violated his constitutional rights and his rights under RLUIPA. See Blount v. Johnson, 7:04CV00429 (W.D. Va. 2007) Ultimately, the court denied defendants' motion for summary judgment in that case and scheduled an evidentiary hearing on whether or not Blount had a sincere religious belief requiring him to eat a diet consistent with the CFD at the time he first requested the diet. On May 17, 2007, before the hearing occurred, prison officials made an administrative decision to place Blount on the CFD. (Id., Findings of Fact, Para. 4, May 30, 2007) Accordingly, the court dismissed as moot Blount's claim for injunctive relief ordering that he be placed on the CFD. (Id.) Based on evidence developed in the record and at the May 30, 2007 evidentiary hearing, the court made a factual finding that "in April and June 2004, Blount had a sincere, religious belief that continues to this day that he, according to his understanding of the House of Yahweh religion, should eat a kosher diet." (Id., Findings of Fact, Para. 1).

## B. Current Claims and Evidence

Blount states that for fourteen months in 2007 and 2008, he received the CFD meals. He alleges the following sequence of facts on which his current claims are based. On June 21, 2008, Officer Phillips gave Blount a regular meal tray over Blount's objection, saying that Blount's name had been removed from the CFD list. Blount refused to eat the regular meal and asked to see a supervisor. At Phillips' request, he returned the tray. On June 26, 2008, Blount received a "notice of [CFD] removal," indicating that he had been accused of violating the procedural conditions imposed on those inmates receiving the diet and that he would receive an ICA hearing on July 1, 2008.

No ICA hearing occurred. On July 1, 2008, officers served Blount a regular meal tray. When Blount objected, they told him that Counselor Stallard and Treatment Program Supervisor

- 3 -

("TPS") Reynolds had told kitchen personnel not to give Blount CFD meals anymore because he had been removed from the approved list. Blount filed an informal complaint on July 1, 2008, complaining that he had been removed from the CFD list and was receiving regular meal trays over his objections. (MSJ, Attach. 1, Encl. A.) Lt. Fleming responded to the informal complaint on July 9, 2008, stating:

> Treatment staff advised that you were removed from Common Fare due to your refusal to sign the agreement. They advised that once you signed the agreement you will be placed back on Common Fare status.

(Id.) Blount then filed a regular grievance in which he claimed not to understand Fleming's July 9 response advising him that once he "signed the agreement," he would be placed back on the Common Fare list. Blount asserted, "The Common Fare Committee approved me for the Common Fare in response to litigation I'd won in Federal Court regarding my religious belief to eat a Kosher diet." (Id.) In the Level I response, the warden ruled the grievance unfounded, stating that Common Fare Policy requires all participants to sign an agreement and only because of an oversight, Blount had not been asked to sign the agreement in May 2007 during the previous litigation.[3] (Id.) The warden's level I response also advised Blount: "[Y]ou will be permitted to again receive the Common Fare Meals as soon as you sign the Common Fare Agreement." Blount appealed. At Level II of the grievance process, the warden's finding was upheld.

Blount brought this lawsuit in September 2008, alleging that discontinuation of the diet in July 2008 violated his rights under the First Amendment, RLUIPA, and the Due Process Clause of the Fourteenth Amendment.[4] He argues that he should not have been removed from the CFD list on July 1, 2008 simply for being seen returning a regular food tray, as no officer had reported

---

[3] The warden's Level I response also stated that Blount had been placed on the Common Fare diet pursuant to a court order. However, the court has entered no order in either of Blount's civil cases directing VDOC officials to place, or to keep, Blount on the diet.

[4] In this case, Blount sued Red Onion Warden Tracy Ray; VDOC Regional Director Larry Huffman; Treatment Program Supervisor Q. Reynolds; and "CMC Reynolds."

- 4 -

seeing him eat nonkosher food. He also argues that after the July 1, 2008 discontinuation of his CFD meals, he did not receive an ICA hearing and that the grievance procedures by which he raised his complaints to prison officials delayed resolution of the issue for months, during which time he was forced to eat the regular menu in violation of his religious beliefs. Blount claims that the Common Fare agreement has never been brought to him to sign and that being forced to eat a nonkosher diet chilled his ability to exercise his sincerely held religious beliefs and caused him mental anguish and stress at the "defilement of his body." As relief in this suit, Blount seeks monetary damages and injunctive relief to be reapproved for CFD participation.

In support of their motion for summary judgment, defendants offer the affidavits of Warden Ray, TPS Reynolds, and Gary Bass. According to Reynolds, on June 21, 2008, Officer McNight reported that he had seen Blount return a regular tray, although he was on CFD meals at the time; as a result of this report, Reynolds removed Blount from the CFD list.[5] On July 1, 2008, Reynolds went to Blount to conduct a review of his CFD status. Blount argued to Reynolds that he could not be suspended from the CFD for violating the conditions on the CFD agreement because he had never signed one. At that point, Reynolds investigated and found that Blount had, in fact, not signed a CFD agreement when he was approved for the diet in May 2007. Reynolds reports that he had a counselor bring a copy to Blount to sign, but Blount refused. Enclosure B attached to Reynolds' affidavit is a photocopy of a Common Fare agreement dated July 1, 2008, for Inmate #300349 D. Blount; on the signature line, someone has written, "Refused to sign." Reynolds states that he and Counselor Stallard informed Blount on July 1 that as soon as he signed the agreement, he would receive the CFD meals.[6] According to Warden Ray's December 4, 2008 affidavit, Blount has never signed a Common Fare agreement.

---

[5] Defendants do not include a copy of McNight's report as an attachment to their motion.

[6] In response, Blount asserts that Reynolds did not come to his cell at all on July 1, 2008. He claims that he was simply removed from the CFD list on that date and that no one has ever brought him a copy of the CFD agreement to sign. He offers an affidavit from Inmate Jackson in the adjacent cell, stating that Stallard, not Reynolds, came to Blount's cell on July 1, 2008, and that Stallard informed Blount that Reynolds would remove him from the CFD.

Gary Bass, Chief of Operations for Offender Management Services for the VDOC,

executed an affidavit on December 8, 2008, stating:

> Ordinarily we would consider a prisoner's refusal to sign the [Common Fare] Agreement as an indication from him that rather than having a sincere belief in a need for the Common Fare program, he is more interested in playing games with prison personnel. Where the responsibility rests with agency personnel to judge religious sincerity, the refusal is an alert that we likely made the wrong decision in admitting a prisoner to the Common Fare program. But . . . Blount is in the unusual position of having had a court make the religious sincerity determination. Accordingly, a decision has been made to instruct prison personnel to offer Blount another opportunity to sign the Agreement. If he refuses, then his refusal is to be documented, but he will be readmitted to Common Fare. He will thereafter, however, be subject to the same rules that apply to those inmates on Common Fare who have signed the Agreement.

(MSJ, Attach. 4, ¶ 10). Apparently, Blount began to receive CFD meals after December 8, 2008.

His complaint addresses the period when he did not receive CFD meals – from approximately

June 21 to December 8, 2008.

## Discussion

Summary judgment is proper where there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for

summary judgment, the court must view the facts, and the inferences to be drawn from those

facts, in the light most favorable to the party opposing the motion. United States v. Diebold,

Inc., 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party

who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue

of material fact exists if reasonable jurors could find by a preponderance of the evidence that the

nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 252 (1986).

### A. Religious Rights

A prisoner has a clearly established right under both the Free Exercise Clause of the First

Amendment and RLUIPA to receive a diet consistent with his religious beliefs. Lovelace v. Lee,

- 6 -

472 F.3d 174, 198 (4th Cir. 2006); Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973) (free exercise clause). In deference to the expertise of prison administrators in managing the difficult challenges of incarceration, however, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge so long as it is rationally related to a legitimate governmental interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89-91 (1987).[7] RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." 42 U.S.C.A. § 2000cc-1(a)(1)-(2). The inmate plaintiff bears the burden of proving that the challenged prison practice places a substantial burden on his exercise of sincere, religious beliefs; only if he carries this burden, must the government prove that the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling interest by the least restrictive means. § 2000cc-2(b).

Only personal practices that are both sincerely held and rooted in religious belief fall under the protections of the Free Exercise Clause or RLUIPA. Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972); Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13 (2005) (noting that under RLUIPA, "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic" and whether his "professed religiosity" is "sincere"). "Evidence of nonobservance is relevant on the question of sincerity," but is not "conclusive of insincerity." Reed v. Faulker, 842 F.2d 960, 963 (7th Cir. 1988) (recognizing that "an inmate may adopt a religion merely to harass the prison staff with demands to accommodate

---

[7] Under Turner, the court must consider four factors in addressing an inmate's constitutional claim: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (c) whether the extent to which accommodation of the asserted right will have an impact on prison staff, on inmates' liberty and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns. Id. at 89-91.

his new faith"). Clearly, distinguishing between religious and secular beliefs, sincere or insincere, is difficult. <u>See, e.g.</u>, <u>Frazee v. Illinois Employment Security Dept.</u>, 489 U.S. 829, 833 (1989). Nevertheless, sincerity of belief is the critical, threshold aspect of the inquiry the court must make in this case: whether Blount's asserted belief that he should observe kosher dietary laws was a belief "sincerely held and . . . in [his] own scheme of things, religious" at the time that his current claims arose. <u>United States v. Seeger</u>, 380 U.S. 163, 185 (1965).

It is only logical that an inmate's religious beliefs may change over time and that his sincerity in holding and practicing such beliefs may also wane or disappear altogether. Even where an inmate has previously demonstrated that the practice for which he seeks accommodation was required by religious beliefs that he sincerely held during that previous time period, prison officials cannot be required to maintain accommodation of that practice, if the inmate later behaves in ways that clearly reflect a lack of sincerity in the professed belief or an alternative, non-religious motive for demanding continued accommodation.

## B. Procedural Principles

The Supreme Court noted in <u>Cutter</u> that the lawmakers who supported the enactment of RLUIPA

> anticipated that courts would apply the Act's [compelling interest/least restrictive means] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

544 U.S. at 722 (internal quotations and citations omitted). The Court further stated that if an inmate's "requests for religious accommodations . . . jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." <u>Id.</u> at 726. The same judicial deference to the expertise of prison officials in setting procedures as necessary for the orderly operation of the facility applies when an inmate has requested accommodation of a religious belief under the First Amendment. <u>See</u> <u>O'Lone</u>, 482 U.S. at 349; <u>Block v. Rutherford</u>, 468 U.S.

- 8 -


Case 7:08-cv-00504-JCT-mfu   Document 27   Filed 07/17/09   Page 8 of 15   Pageid#: 133

576 (1984) (courts cannot substitute their own judgment on institutional management for that of prison officials).

To succeed on a procedural due process challenge to VDOC procedures regarding the Common Fare diet, plaintiff must prove the factors set forth in Wilkinson v. Austin, 545 U.S. 209, 221-26 (2005). First, he must show that he had a liberty interest arising from the Constitution itself or from state law. Id. at 221. Second, he must show that the procedures in place to protect that interest are constitutionally inadequate under the framework implemented by the Supreme Court in Mathews v. Eldridge, which mandates analysis of three separate factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Wilkinson, 545 U.S. at 224-25 (quoting Mathews, 424 U.S. 319, 335 (1976)).

## C. Defendants' Motion for Summary Judgment

Under these principles, the court concludes that the defendants are entitled to summary judgment as a matter of law. For the reasons stated below, Blount fails to establish any genuine issue of material fact as to whether the VDOC procedures governing participation in the Common Fare diet are violative of the First Amendment, the Due Process Clause of the Fourteenth Amendment, or RLUIPA. For reasons stated in the next subsection, he also fails to present evidence on which he could prove that the CFD procedures as applied to him in the summer and fall of 2008 violated his rights under the Constitution or RLUIPA.

### 1. The Common Fare Diet Procedures

As they are clearly entitled to do under RLUIPA and the First Amendment, VDOC administrators have implemented procedures governing the administration of the agency's religious diet accommodations for inmates. The CFD procedures themselves do not impose any burden on an inmate who wishes to follow the diet based on his sincerely held religious beliefs: he must merely sign an agreement and comply with its terms, which essentially require that he

- 9 -

receive at least a certain percentage of the CFD meals and refrain from eating or trading foods not consistent with the CFD diet. As Blount fails to prove that the CFD agreement procedures place a substantial burden on inmates who desire the accommodation, the procedures survive scrutiny under either the First Amendment or RLUIPA without further analysis. § 2000cc-2(b).

In any event, defendants have also offered evidence that the CFD procedures further compelling state interests by the least restrictive means. The procedures further the efficient and economic administration of this religious accommodation in several ways. The agency has a compelling interest in using one, uniform procedure for monitoring which inmates have been approved for CFD status and ensuring that those prisoners adhere rigidly to the CFD program. The CFD menu items are more expensive that the VDOC main menu items, so officials have an interest in ensuring that prisoners receiving the CFD do so because of their sincere religious beliefs and not because they prefer the CFD menu items for some other reason, such as boredom with the main menu. Also, the food service staff needs to maintain a close approximation of the number of prisoners who are to receive the CFD, so that ordering of food items does not result in too few CFD meals or more than necessary, so that food goes to waste. Requiring a CFD-approved inmate to sign the CFD agreement puts the inmate on notice of the VDOC's administrative concerns and of the conditions he must follow to continue receiving the diet; by signing the agreement, he commits to compliance with those conditions. The agreement form also notifies the inmate of the consequences to which he will be subject if he violates the CFD conditions. Thus, the CFD agreement procedure and its enforcement allow officials to ensure that they are providing the special, more expensive Common Fare meals only to inmates who continue to have a sincere, religious belief requiring that diet. As to the general application of the CFD program, the record does not suggest any less restrictive means of furthering these interests and goals.[8]

---

[8] Blount argues that since he has been maintained on the diet for several months without signing a CFD agreement, but has still been subject to its conditions, his case itself demonstrates a less restrictive means to administer the diet. On the contrary, his case offers a prime example of why making every

Finally, the court finds no material fact in dispute in this case that the existing procedural protections available to inmates on the CFD program satisfy the dictates of due process under Wilkins and Matthews. Wilkins, 545 U.S. at 221-25; Mathews, 424 U.S. at 335. For a first or second violation of CFD procedures, the sanction is temporary suspension from the diet. If an inmate believes that the report of his violation is erroneous, he may file an informal complaint, then a grievance, and an appeal. These procedures allow an inmate to protest a wrongful removal immediately and have that matter investigated as soon as possible. For example, while Blount did not like the outcome of the investigation in his case, it nevertheless occurred within ten (10) days. An inmate who has reportedly violated CFD conditions for the third time, and faces permanent removal, first receives a hearing and then an appeal. Blount fails to present any genuine issue of material fact in dispute as to whether the administrative burdens of conducting an ICA hearing after every reported violation of CFD procedures would be more effective in protecting against wrongful deprivation of the diet than the investigation generated by an informal complaint under the current system.

## 2. CFD Procedures as Applied to Blount

Several preliminary findings are necessary before the court can address defendants' summary judgment arguments regarding Blount's claims about how the CFD procedures were applied to him.

First, prior to this memorandum opinion, the court had made no ruling regarding the sincerity of Blount's religious beliefs related to his current claims. The court's finding in Case No. 7:04CV00429 in May 2007 that Blount had demonstrated a sincere, religious belief in keeping Kosher was based on the evidence adduced in that case and applied only to the time periods covered by his claims in that case (April 2004 through May 2007). It cannot be read to

---

inmate who receives the CFD meals read and execute a CFD agreement is so important to furtherance of the state's interests in orderly administration of the diet.

- 11 -

extend indefinitely into the future to vaccinate Blount against ever being denied his religious diet for any reason.

Second, the court has made no ruling that Blount should continue to receive the Common Fare meals even if he refused to comply with CFD procedures. By the time the court held its hearing in Case No. 7:04CV00429 in May 2007, Blount was already receiving the CFD, so his claims for injunctive relief regarding receipt of the diet in that case were dismissed as moot.

Third, it is undisputed that Blount has never signed a CFD agreement. He makes no viable argument that the agreement signature requirement is unreasonable and does not demonstrate that signing an CFD agreement and complying with its terms would violate his religious beliefs in any way. He merely claims that (1) he has never been given an opportunity to sign a Common Fare Agreement as required under the VDOC procedure, and (2) because he has never signed an agreement, but receives the CFD anyway, the VDOC has no compelling interest in making him sign.

Fourth, it is undisputed that Blount learned no later than July 11, 2008 that in order to begin receiving his religious diet again, all he had to do was sign a CFD agreement. The parties disagree about other events. Defendants assert that Lt. Reynolds informed Blount, in person, on July 1, 2008, that if he signed the CFD agreement, he would be returned to the CFD list. Blount denies that the meeting with Reynolds occurred, and he maintained in his July 12, 2008 regular grievance that he did not know what he needed to sign to get his diet back. Although it is entirely incredible that Blount did not know about the CFD agreement or the normal procedural requirement that an inmate must sign such an agreement before receiving the diet, the court finds no material dispute here. Documentation clearly reflects that Lt. Fleming's July 9, 2008 response to Blount's informal complaint instructed him that if he "signed the agreement," he would be put back on the CFD list. Even if Blount did not know from Fleming's response or otherwise precisely what "agreement" he needed to sign in order to reclaim his CFD status, he was then on notice to ask for an opportunity to sign that agreement. Instead of making that inquiry, on July

- 12 -

12, Blount filed a grievance, arguing erroneously that his prior court case gave him some separate right to CFD status, whether or not he signed an agreement. Instead of taking the only simple step that prison officials required in order for him to practice his religious dietary beliefs once again, he chose to forego indefinitely his practice of the diet in favor of fighting against prison procedures and, ultimately, pursuing this lawsuit.

The court finds and concludes that Blount's failure to inquire about and sign a CFD agreement immediately after he received Fleming's response to his informal complaint on July 11, 2008, establishes that his sincerity regarding his religious dietary beliefs had waned between May 2007 and the summer of 2008. His behavior demonstrates that his religious need for the diet was no longer sincere enough to motivate his actions. Rather, his personal desire to pursue procedural arguments and harass the defendants with an unnecessary lawsuit took precedence, and he was willing to sacrifice his religious dietary beliefs in favor of these secular pursuits. Indeed, he would be without his religious diet to this day, more than a year later, if defendants had not relented in an abundance of caution in light of the court's sincerity finding for the earlier period and accommodated his dietary beliefs without requiring compliance with their normal CFD procedures.

As Blount thus fails to offer evidence on which he could prove that his religious dietary beliefs were sincere in the summer of 2008, the court finds that defendants are entitled to summary judgment as a matter of law as to all of Blount's claims in this lawsuit.[9] Absent proof of sincerity, he had no right to accommodation of his religious dietary beliefs under the First

---

[9] Blount has moved to amend his complaint to add additional defendants: the food operations director, the food operations manager, and the kitchen supervisor. (See Dkt. No. 21.) He originally identified these defendants as "John Doe[s] 1-4, - kitchen supervisors." The court will grant the amendment to substitute three individuals for the John Doe defendants. As it is clear from the record that Blount had no sincere religious belief regarding his need for a Kosher diet at the time the claims in this lawsuit arose, however, all claims against the new defendants will be dismissed, pursuant to 28 U.S.C. § 1915A(b)(1).

- 13 -

Amendment or RLUIPA.[10]  Thus, defendants are entitled to judgment on his claims under these provisions.  Moreover, as his First Amendment claim fails, he also fails to prove that he had any federally protected liberty interest in receiving the diet, and defendants are entitled to judgment on his procedural due process claim as well.

Furthermore, Blount's request for injunctive relief directing prison officials to provide him with the CFD meals must be denied, as he is currently receiving the diet.  He has no constitutional or statutory right to receive absent his compliance with prison procedures, including the requirement that he sign a CFD agreement.  While the court makes no finding as to the sincerity of Blount's religious beliefs at the present time, in the summer of 2009, the court sees no constitutional infirmity in a potential mandate from prison officials that Blount will be once again removed from the Common Fare diet if he fails to execute a Common Fare agreement within ten (10) business days.

### Conclusion

For the stated reasons, the court concludes that defendants' motion for summary judgment must be granted, and plaintiff's request for injunctive relief must be denied.  An appropriate order will be entered this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

---

[10]  **The court intends this ruling to apply only to the period covered by the claims in this lawsuit, from summer 2008 through early December 2008, when Blount began receiving the diet once again.**

- 14 -

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and counsel of record for the defendants.

ENTER: This _17th_ day of July, 2009.

Senior United States District Judge

- 15 -